UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CTO Assoc. Ltd. Partnership, *et al.*,<br>    *Plaintiffs*,<br><br>    v.<br><br>Conopco, *et al.*,<br>    *Defendants*. | Civil No. 3:10cv834 (JBA)<br><br><br><br>August 31, 2011 |

RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs CTO Associates Limited Partnership ("CTO") and Eight St. James Leasing Co., Inc. ("ESJ") sued Defendants Conopco, Inc. ("Conopco") and Unilever United States, Inc. ("Unilever United States") for breach of warranty, anticipatory breach of ground lease, breach of sublease, breach of implied covenant of good faith and fair dealing, breach of quiet enjoyment, tortious interference with business expectancy, breach of guaranty, and declaratory judgment. The parties' dispute arises out of three agreements entered into in 1983, under which Defendants are obligated to provide certain "appurtenances" to Plaintiffs.

Plaintiffs now move for partial summary judgment, specifically a declaratory judgment that Conopco is prohibited from terminating Plaintiff's continued use of these appurtenances, i.e. Defendants' wastewater treatment system, fire suppression system, and additional parking spaces. Defendants cross–move for summary judgment on Plaintiffs' claims and counterclaim for a declaratory judgment that Defendants have no obligation to continue to provide those services to Plaintiffs. For the reasons that follow, the Court concludes that provision of those three services is not necessary for use of the property at issue, and thus they are not "appurtenances." Accordingly, Plaintiff's motion will be denied and Defendant's motion will be granted.

I.   Background

The dispute between the parties arises out of a sale–leaseback arrangement, whereby a two–story building in Clinton, Connecticut called the Logistics Center was conveyed from Defendant's predecessor, Cheesebrough–Ponds, Inc. ("Cheesebrough") to Plaintiff, along with all appurtenant rights, and the building was leased back to Defendant Cheesebrough and its successor by merger, Conopco, for 25 years. From before the date of this transaction—November 30, 1983—and continuing through the end of the lease, Cheesebrough and its successor Conopco allowed its employees who worked at the Logistics Center to park on its nearby plant premises ("Plant"), supplied a wastewater connection for the Logistics Center which ran to the Plant where the wastewater was treated or sent offsite for treatment, and provided a water connection between the Plant and the Logistics Center to operate the latter's fire–sprinkler system. Plaintiff argues that the sale–leaseback contract obligated Defendant to continue to provide these three services to the Logistics Center building, characterizing them as "appurtenances." Defendant denies any such continuing obligation to provide these "conveniences" beyond the period that it occupied the Logistics Center under the lease terms.

A.   The Contracts

In the Improvements Deed and Corrected Improvements Deed, entered into as part of the sale–leaseback in November 1983, Cheesebrough conveyed to CTO the Logistics Center in fee simple, specifically

> all of the Grantor's remaining interest in the buildings, fixtures and improvements constructed or located on that parcel or lot of ground, situate, lying or being in the Town of Clinton . . . described in Schedule A.

> EXCEPTING AND RESERVING unto the Grantor, however, all of the Grantor's right, title and interest in and to said parcel or lot of ground.
>
> TO HAVE AND TO HOLD the above granted and bargained premises, with the appurtenances thereof, unto the said Grantee, its successors and assigns forever to it and their own proper use and behoof.

(Corrected Improvements Deed, Ex. A to Pl.'s 56(a)1 Stmt.)

The parties also entered into a ground lease as part of the transaction, pursuant to which Chesebrough leased to CTO the premises underlying the Logistics Center (the "premises"), excluding the building itself, fixtures, and improvements that were the subject of the Improvements Deed. It was amended by a First Amendment dated June 21, 1984 (collectively, the "Ground Lease"). (*See* Ex. B to Pl.'s 56(a)1 Stmt.) The Ground Lease provides, in pertinent part,

> Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, upon the terms and conditions stated in this Lease, the real property located in Clinton, Connecticut, described in Schedule A to this Lease, together with all necessary and appropriate access, parking and utility easements and all other appurtenant rights (the "Lease Premises"). This Lease does not include any improvements.

(*Id.* at 1.)

On or about November 30, 1983, CTO, as landlord, entered into a master lease, amended on June 21, 1984 (the "Master Lease") with ESJ as tenant, for the lease of the real property and improvements conveyed by the Improvements Deed and the Ground Lease, which expires on December 19, 2013. On the same day, ESJ, as sub–landlord, entered into a sublease (the "Sublease") with Chesebrough, as sub–tenant, for the lease of the real property which is the subject of the Master Lease, which expired on December 19, 2008.

3

Section 7(a) of the Sublease, titled "Repairs, Alterations, Future Development" provides, in pertinent part,

> Throughout the term, Tenant, at its own cost and expense, shall maintain in thorough repair and good, safe and substantial order and condition, ordinary wear and tear excepted, all improvements at the Leased Premises, including all building equipment which is an integral part of the building structure, both inside and outside, shall make all structural and non–structural, ordinary and extraordinary, foreseen and unforeseen repairs, replacements and extensions, and shall take such other action as may be necessary or appropriate to keep and maintain the Leased Premises in good order and condition.

(Sublease, Ex. C to *id.* at 5.) Section 7(b)(i) of the Sublease further provides that "[s]ubject to the restrictions in this Lease, and if no Event of Default is continuing, Tenant may . . . alter or remodel any improvement on the Leased Premises, if neither the market value of any improvement so altered or remodeled nor its usefulness in Tenant's business is adversely affected thereby." (*Id.* at 6.) Section 7(b)(iv) of the Sublease provides "[n]o addition, improvement or alteration shall render any of the buildings or improvements on the Leased Premises anything other than a self–contained unit or units, capable of being operated independently of any buildings or improvements situated on premises other than the Leased Premises." (*Id.* at 6.)

### B. The Three Services

Prior to and during the 25–year period of the Sublease, Defendants handled certain services jointly at the Plant and at the Logistics Center. Specifically, the Plant (1) supplied a water connection to the Logistics Center for fire sprinklers, (2) provided a connection for wastewater generated at the Logistics Center to the Plant, where it was treated and disposed of by the Plant's wastewater treatment plant, and (3) allowed Conopco employees at the

4

Logistics Center to park in designated parking areas on the Plant's grounds. (Santella Aff. ¶ 10.)

The Sublease terminated at the end of 2008, and Conopco vacated the Premises. (*Id.* ¶ 15.) Defendants advised ESJ that they intended to turn off the water and wastewater connections between the Logistics Center and the Plant, however, based on discussions with its maintenance staff, Defendants have kept open the use of wastewater connection and the water connection for the fire sprinklers. (*Id.*) There are no recorded easements relating to these properties. (*Id.* ¶ 16.)

During the Sublease, Conopco made all repairs as required at its own cost and took all necessary and appropriate actions to keep and maintain the premises and the Logistics Center. (*Id.* ¶ 20.) When the Sublease expired, on December 19, 2008, Conopco returned the Logistics Center and the premises to ESJ in the same condition as existed at the beginning of the Sublease and in good order and condition. (*Id.* ¶ 21.)

Plaintiffs' property–manager agent wrote to Defendants on August 14, 2008, arguing that Conopco was obligated to continue wastewater treatment under the terms of the Sublease (Ex. 3 to Santella Aff.), and their lawyers wrote to Conopco in September 2008, arguing that the Sublease obligated Conopco to continue to provide the wastewater and water connections and parking privileges (Ex. 4 to Santella Aff.).

According to Santella, Unilever's Americas Real Estate Lead, due to the expense of treating wastewater on–site at the Plant, Conopco obtained a Connecticut Department of Environmental Protection permit to haul wastewater offsite. (Santella Aff. ¶ 43.) He says that "[t]here are alternatives for wastewater treatment and/or disposal at the Logistics Center apart from sending such wastewater to the Plant," constituting an alternative that is

5

"economically and practically viable, which is one of the reasons [Defendants] are pursuing it at the Plant." (*Id.*) Santella also avers that "the Logistics [Center] already has another water supply. There is an existing water connection running into the building from the Town of Clinton," to which "[t]he fire sprinkler safety system at the Logistics [Center] could easily be hooked up." (*Id.* ¶ 44.) Santella also avers that there is currently an area with 97 parking spaces on 9 John Street available to the Logistics center, which constitutes a legal, non–conforming use permitted by the Town of Clinton, and "there are vacant lots in close proximity to 9 John Street and the zoning regulations allow shared off–site parking." (*Id.* ¶ 45.) Plaintiffs point to no evidence to the contrary.

## II. Discussion[1]

### A. Corrected Improvements Deed and Ground Lease

The parties' dispute is whether the Corrected Improvements Deed and the Ground Lease obligate Conopco to continue providing (1) water from the Plant for the Logistics Center for fire sprinklers, (2) access to the Plant's wastewater treatment for the Logistics

---

[1] As a preliminary matter, Plaintiffs argue that large parts of the Santella Affidavit are inadmissible because they are based on hearsay or are improper opinion. Most of the statements to which Plaintiffs object do not implicate material facts. However, Plaintiffs maintain that Defendants have provided no foundation for Santella's assertions that alternatives for wastewater treatment and/or disposal at the Logistics Center, including having it hauled offsite, are economically viable, that "[t]he fire sprinkler safety system at the Logistics Building could easily be hooked up to the water connection provided to the building by the Town of Clinton," which would be "affordable and practical," and that there are economic and practical alternatives for additional parking in the area. Santella is Unilever's Americas Real Estate Lead, is "responsible for managing all of the Company's real estate holdings and interests in the Americas," and has "been in charge of Unilever's North American real estate interests for the past seven years," and in that context is "personally familiar with the Conopco plant located in Clinton," and "knowledgeable concerning the sale–leaseback transaction that took place on or about November 30, 1980." (Santella Aff. ¶¶ 1–6.) Thus, Santella has been shown competent to provide these opinions.

Center, and (3) parking at the Plant reserved for employees working at the premises on 9 John Street. The parties acknowledged at oral argument that in essence, this case turns on whether the three services are "appurtenances," which the contracts at issue conveyed to CTO.

Relying on the definition of an appurtenance in the Merriam–Webster Online Dictionary as an "incidental right (as a right–of–way) attached to a principal property right and passing in possession with it," Plaintiffs maintain that "[w]ithout the wastewater treatment system, fire suppression system and additional parking spaces, the Logistics Center simply cannot be properly used," and accordingly, those services "are considered appurtenant to the Premises." (Pl.'s Mem. Supp. at 13.) Plaintiffs also argue that the Ground Lease conveying "together with all necessary and appropriate access, parking and utility easements and all other appurtenant rights" includes the benefit of the parking spaces and appurtenant rights to CTO.

Under Connecticut law, "[t]he term [appurtenance] denotes a connection between two objects such that one is incident to the other." *Bowman v. Williams*, 5 Conn. App. 235, 239 (1985).[2] For instance, the Connecticut Supreme Court has held that "[a] right to convey water from a distant source of supply may be appurtenant to a tenement separated from that on which such source of supply is situated by several intervening parcels of land, each belonging to a different proprietor." *Graham v. Walker*, 78 Conn. 130 (1905).

---

[2] Black's Law Dictionary defines appurtenance as "[s]omething that belongs or is attached to something else." The term appurtenance "generally means something appertaining to another thing as principal and passing as an incident to such principal." *Whittlesey v. Porter*, 82 Conn. 95 (1905). However, "[t]he concept of appurtenant in the context of property law 'does not require that something be annexed, joined, or attached to be appurtenant.'" *Bowman,* 5 Conn. App. at 239.

In order for rights to be appurtenant, they must be "essential to or reasonably necessary for the full beneficial use and enjoyment of" the land to which they are associated. *See Bowman*, 5 Conn. App. at 239–40 (a boat slip leased separately from an office that was not "essential to or reasonably necessary to the full beneficial use and enjoyment of the office and storage space" was not deemed an appurtenance of that office); *see also, e.g., Prior v. Swartz*, 62 Conn. 132 (1892) ("[W]ater of sufficient depth to float vessels is an essential part of every wharf, a necessary incident thereof or appurtenance thereto, without which there can be no wharf and no wharfage," and therefore, "a proprietor of land adjoining Stamford harbor, and waters of a like character in this state, has a right to connect himself with navigable water by means of wharves or channels extending from and adjacent to his uplands, so long as he does nothing to interfere with the free navigation of the waters.").

### 1. *Parking spaces at the Plant*

Plaintiffs argue that parking at the Plant is necessary for the Logistic Center's viability because people who work at the Logistics Center drive there and need somewhere to park. However, although employees who drive to work at the Logistics Center need to leave their cars somewhere in order to work there, there is no evidence in the record that parking only at Plant is necessary, and in fact, Santella avers that there are several vacant lots in close proximity to the Logistics Center, and the zoning regulations allow shared off–site parking.[3] Thus, the parking spaces at the Plant, while convenient for people who work at Logistics Center, are not necessary to its continued use and enjoyment and are not appurtenant.

### 2. *Wastewater treatment*

---

[3] The Ground Lease includes reference to "parking," but the parking referred to is the 97 spaces on the premises.

Plaintiffs argue that there are no alternatives to the wastewater connection from the Plant to the Logistics Center, and therefore, that connection enabling the Logistics Center to dispose of its waste is necessary for the building's continued viability. However, Santella states that Plaintiffs have the option of arranging for wastewater to be hauled offsite from the Logistics Center for disposal, which is exactly how that waste is ultimately disposed from the Plant. There is no evidence that this option for disposal from the premises would be prohibitively expensive. Thus, the only evidence in the record is that the wastewater connection is one of at least two options for waste disposal from the Logistics Center, meaning it is not necessary for the continued use and viability of the Logistics Center.

### 3. *Water rights for fire sprinklers*

Finally, Plaintiffs argue that the Logistics Center cannot function without a water source with sufficient pressure for its fire–sprinkler system, which Defendants currently provide from the Plant. Where adequate alternative supplies of water are available, existing water connections are not appurtenant. *See City of Waterbury v. Rigney*, 79 Conn. 60, 60 (1906) (a deed of land by the defendant to the city of Waterbury "with the appurtenances" but no reference to water rights or the use of water from pipes did not convey to Waterbury appurtenant rights to "take water from the pond on the defendant's land" because "it was not necessary to the proper use and enjoyment of that land by the city for the purposes for which it was conveyed, the brooks and spring upon the land furnishing an adequate supply of water"). As the court explained in *Rigney*, "[t]he mere fact that it may have been more convenient to take water from the pond on the defendant's land than to take it from the brooks or spring on the land conveyed to the city, did not create a right or easement in the city to take water from the pond in question. Such a right would not pass as an appurtenance

9

unless it was necessary to the enjoyment of the thing granted." *Id.* Given Santella's averment that "[t]here is an existing water connection running into the building from the Town of Clinton" that could easily be "hooked up to" the fire sprinkler system in the Logistics Center, the water supply from the Plant has not been shown to be necessary and is therefore not appurtenant.

Because evidence of alternative options means that neither parking at the Plant, nor the wastewater connection, nor the water for the fire–sprinkler system is necessary and essential for the continued use and viability of the Logistics Center, none are appurtenant even though they may be convenient, and Defendants are not obligated under the Corrected Improvements Deed or the Ground Lease to continue providing such services to Plaintiffs.

B.  The Sublease

Plaintiffs also argue that termination of the three services would violate the Sublease, insofar as such termination would constitute an alteration to the leased premises that would render the premises "to no longer be self–contained [and] capable of being independently operated." However, Section 7(b)(iv), on which Plaintiffs rely, would apply if Defendants had made alterations during the term of the sublease, and it is undisputed that upon expiration of the Sublease, Defendants had not yet terminated any of the three services; thus, any such alteration did not occur during the Sublease period and is not subject to the Sublease. Further, as discussed above, there is evidence that the Logistics Center could be independently operated with offsite wastewater treatment, parking at other lots, and water for the sprinkler system from the Town of Clinton, access to which is easily available; therefore, termination of the services would not violate the Sublease.

III.    Conclusion

Accordingly, Plaintiffs' [Doc. # 31] Motion for Partial Summary Judgment is DENIED, and Defendants' [Doc. # 34] Cross Motion for Summary Judgment is GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 31st day of August, 2011.